FREDERICKA HOMBERG WICKER, Judge.
| ?The plaintifi/appellant, Dr. Eric R. George, appeals the trial court’s judgment which dismissed his petition against the defendant/appellee, Mr. Edwin White, for breach of contract and violations of Louisiana Securities Law. For the reasons that follow, the judgment appealed from is affirmed.
Factual and Procedural Background
Mr. Allen[1] Donner, Dr. Eric George’s investment advisor, learned of a real estate investment opportunity from Mr. Aaron Broussard. After speaking with Mr. Broussard, Mr. Donner telephoned Mr. Edwin White, the sole member of Ed White and Associates, LLC, in August of 2007 to gather more information about the opportunity. During the telephone conversation, Mr. Donner disclosed that he was calling on Dr. George’s behalf and wanted to learn more about the investment. Mr. White provided Mr. Donner with some general information about the investment, and the two scheduled an in-person meeting to discuss the investment *1038 further. The meeting was held at the office of Ed White and Associates.
| ¡¡During that meeting, Mr. White informed Mr. Donner that the investment was a limited partnership in MBS Yellowstone Ranch (Yellowstone), which would acquire the Yellowstone Ranch Apartments — a luxury apartment complex located in Texas. Mr. White also disclosed that Michael B. Smuck was his partner in Yellowstone. Mr. White provided Mr. Donner with some written materials about the investment, including a subscription agreement. After the meeting, Mr. Donner conducted due diligence, which included getting comfortable with the investment and also investigating Mr. White, with whom neither he nor Dr. George had ever had any prior business dealings. Mr. White did not, however, conduct any research to determine whether in fact Yellowstone had been formed. Mr. Donner presented the investment opportunity to Dr. George once he completed his due diligence, and Dr. George decided to invest.
Dr. George issued Check No. 634, drawn on his personal account at Regions Bank, in the amount of $200,000.00. The check was made payable to MBS Yellowstone Ranch Ltd. and was dated August 17, 2007. Pursuant to Mr. White’s instructions, Mr. Donner hand delivered the check to Mr. White’s office that day. On the advice of Mr. Donner, however, Dr. George did not sign the subscription agreement due to a clause contained therein. Paragraph 1 of the subscription agreement stated:
1. Receipt of Partnership Agreement
I hereby acknowledge receipt of a copy of the Partnership Agreement, and specifically accept and adopt each and every provision of the Partnership Agreement and amendments and agree to be bound thereby.[2]
Because neither Dr. George nor Mr. Donner had received the partnership agreement at the time Check No. 634 was written, Dr. George declined to sign the subscription agreement. Dr. George’s check, along with the other investors’ |4checks, was forwarded to Mr. Smuck— the managing partner of Yellowstone. Check No. 634, which was made payable to MBS Yellowstone Ranch Ltd., was endorsed “FOR DEPOSIT ONLY MBS Realty Investors, LTD.” on August 30, 2007 at Whitney National Bank.[3] Whitney National Bank presented the check for payment at Regions Bank the next day; Regions Bank paid the check.
Approximately one month after Dr. George’s check was deposited, Mr. White became suspicious that something was afoot with the Yellowstone investment. On September 28, 2007, Mr. White, Mr. Smuck, and others held a meeting wherein Mr. White inquired about the Yellowstone project. It was at that meeting that Mr. Smuck admitted to misappropriating the funds. Mr. White then contacted the investors, including Dr. George, by letter dated October 26, 2007 and informed them that he had no knowledge of Mr. Smuck’s “fraudulent and potentially illegal activities.” A few days later, on October 30, 2007, Mr. White, Ed White and Associates, Inc., and Ed White and Associates, LLC entered into an agreement with Mr. Smuck and his entities wherein Mr. Smuck agreed to assign all revenues attributable to his interest in the partnership to Mr. White and his entities until all funds paid *1039 by the Yellowstone investors had been recovered.
Meanwhile, Dr. George contacted Regions Bank and requested that his $200,000.00 be returned due to the improper endorsement on Check No. 634. Rather than return the funds, however, Regions Bank contacted Whitney National Bank regarding the improper endorsement. In January of 2008, Whitney National Bank returned Check No. 634 to Regions Bank with a proper endorsement. After the endorsement was corrected, Regions refused to refund Dr. George’s money.
Dr. George filed a Petition against Mr. White in his personal capacity on September 30, 2009, alleging breach of contract and fiduciary duty, negligence, Rand violations of securities laws pursuant to La. R.S. 51:712 et seq.[4] Mr. White responded with peremptory exceptions of prescription and no right or cause of action on November 17, 2009. Mr. White alleged that Dr. George’s claims brought under La. R.S. 51:714 were subject to a two-year prescriptive period and had prescribed on August 17, 2009 — two years after the $200,000.00 check had been drafted. He further alleged that Dr. George’s negligence claim had prescribed under La. C.C. art. 3492, which provides that delictual actions are subject to a liberative prescription of one year. Mr. White further alleged that Dr. George was estopped, by res judicata, from bringing the action because the present litigation arose from the same transactions and occurrences as those previously dismissed in the federal case.
The trial court heard the exceptions on March 17, 2010. The court ruled on the exceptions in open court but issued its written judgment on April 5, 2010, which denied the exceptions of no right and no cause of action as well as the exception of prescription on the securities claims. The trial court, however, granted the exception of prescription on the negligence claim.[5] The case proceeded to trial on August 15, 2011.[6] At the beginning of the trial, Mr. White reurged the exception of res judica-ta, which the trial court orally denied.
During the trial, testimony was elicited from Mr. White, Mr. Donner, and Dr. George.
Mr. White testified that Mr. Smuck approached him in 1994 about the possibility of forming joint ventures. As a result, Mr. White conducted due ^diligence on Mr. Smuck for a six-to-eight month period before deciding to move forward. After completing due diligence, Ed White and Associates, Inc. and Ed White and Associates, LLC began forming joint ventures with Mr. Smuck in July of 1995. Mr. White stated that everything went “phenomenally well” with Mr. Smuck from that time until the Yellowstone debacle. Mr. White testified that the nature of Ed White and Associates, LLC’s relationship with Mr. Smuck and his entities was that Mr. Smuck and *1040 his entities had 100% managing authority and that Ed White and Associates, LLC had none.
Mr. White testified that he flew to Texas twice to investigate the Yellowstone property before announcing the project. He explained, however, that he did not perform any due diligence to determine whether the partnership had, in fact, been formed. He stated that he did not check the Texas records, because Mr. Smuck handled all the legal and financial matters. He further explained that based on his prior business dealings with Mr. Smuck, he assumed the partnership would be formed. Mr. White stressed, however, that he never represented to Mr. Donner that the partnership already existed. He explained that he specifically told Mr. Donner that the real estate investment fact sheet for Yellowstone had not yet been completed. And as a result, he gave Mr. Donner a sample real estate investment fact sheet which contained a sample partnership agreement. Mr. White stated that he gave those documents to Mr. Donner because the partnership agreements were virtually identical for each transaction.
Mr. White testified that Ed White and Associates, LLC put up a total of $525,000.00 in the Yellowstone project — a $200,000.00 investment and $325,000.00 as seed capital. Mr. White stated that he signed the subscription agreement on behalf of Ed White and Associates, LLC as “Ed White, managing member.” He further explained that he felt comfortable signing the subscription 17agreement without having received the partnership agreement based on Mr. Smuck’s 12-½ year track record of being able to perform. Mr. White admitted that he was aware that Dr. George had not signed the subscription agreement but explained that he was unaware of his reason for not doing so. He added that he could not recall Mr. Donner inquiring about the partnership agreement.
Mr. White testified that he moved quickly to salvage the properties once he learned Mr. Smuck misappropriated the funds. He, his wife, and his entities put up $3.1 million over and above what had been embezzled to preserve as much as they could; otherwise, they would have sustained a $55 million loss. Mr. White stated that, pursuant to the assignment of rights, over half the money Mr. Smuck embezzled from Dr. George had been returned to him from funds that belonged to Mr. Smuck and his entities. Mr. White explained, however, that due to the $3.1 million he paid to salvage the properties, he paid himself back some of the money that had been recouped instead of repaying Dr. George the entirety of his investment. Mr. White further explained that he, his entities, and the other Yellowstone investors filed suit against Whitney National Bank for negligently allowing the Yellowstone checks to be deposited into an account in the name of MBS-Realty Investors, Ltd. He stated, however, that Dr. George elected not to participate in this suit, adding that if he had participated, Dr. George would have received approximately $5,600.00.
Mr. White testified that he has always conducted business in the name of Ed White and Associates, LLC, and that he has never conducted business with third parties in his personal capacity. He admitted, however, that he instructed Mr. Donner to deliver Dr. George’s check to his office, even though the subscription agreement directed investors to mail/deliver checks to the MBS office located in Metairie, Louisiana. Mr. White explained that this was not an uncommon practice.
|RMr. Donner, Dr. George’s investment advisor, testified that he presented the Yellowstone opportunity to Dr. George in *1041 August of 2007 after conducting due diligence on Mr. White. He stated, however, that he did not conduct due diligence concerning Mr. Smuck or Ed White and Associates, LLC, because he believed that he was dealing with Mr. White personally. Mr. Donner further stated that he did not check to see whether the partnership was formed because Mr. White represented that it had been. Mr. Donner stated that he was never under the impression that the partnership was nonexistent. He simply advised Dr. George not to sign the subscription agreement because he did not want Dr. George to attest to receiving the partnership agreement when he had not. Mr. Donner stated that he would not have advised Dr. George to invest in Yellowstone if he had known that it had not yet been formed.
Mr. Donner testified that he learned of the Yellowstone debacle in October of 2007, when Mr. White’s secretary called and asked him to come to the office. Once he arrived, Mr. White gave him a letter essentially stating that Dr. George’s $200,000.00 had been stolen. He stated that Mr. White apologized and stated he would do whatever possible to make Dr. George whole again.
Dr. George testified that he has been investing in real estate personally since 2003. He stated that he signed Check No. 634, payable to MBS Yellowstone Ranch, and gave the check to Mr. Donner. He explained, however, that Mr. Donner advised him not to sign the subscription agreement because he had not yet received the partnership agreement. Dr. George stated that he fully assumed that the partnership had been formed; otherwise, he would not have invested $200,000.00. Finally, he explained that he thought he was investing in Ed White personally.
1⅜At the conclusion of trial, the court took the matter under advisement and issued its Judgment on November 30, 2011, which dismissed all of Dr. George’s claims against Mr. White. Dr. George moved for a devolutive appeal on December 29, 2011.
Assignments of Error
Dr. George assigns the following errors:
1. the trial court erred in finding no agreement between Dr. George and White to invest Dr. George’s $200,000.00; .
2. the trial court erred in finding White fulfilled his burden to prove that he was not personally liable as an agent for the non-existent principal which has never been formed; and
3. the trial court erred in overlooking the false statements circulated by White in offering to sell a security in violation of La. R.S. 51:701, et seq.
Discussion

First and Second Assignments of Error

In his first and second assignments of error, Dr. George contends that the trial court erred by finding that no contract existed between him and Mr. White and by finding that Mr. White is not personally liable as an agent for a non-existent principal.[7] Thus, Dr. George’s central argument is that because he could not have contracted with Yellowstone, an entity that was never formed, Mr. White is personally liable for the losses he sustained.
In reviewing a trial court’s factual findings, Louisiana courts of appeal apply the manifest error standard of review in civil cases. Tompkins v. Savoie, 08- *1042 0808 (La.App. 5 Cir. 3/24/09), 10 So.3d 294, 301 (citations omitted). The manifest error standard of review precludes the setting aside of a district court’s finding of fact 110unless that finding is clearly wrong in light of the record reviewed in its entirety. Id. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Id. The reviewing court should affirm the district court where the district court judgment is not manifestly erroneous. Id.
At the court below, the trial court stated in its reasons for judgment that the documents contained in the record, “do not contain any information to indicate that Dr. George would be contracting personally with Mr. White. Therefore, the Court finds that a contractual agreement did not exist between Dr. George and Mr. White.” After reviewing the entirety of the record in this case, we cannot say that the trial court was manifestly erroneous in its determination.
The record reveals that the subscription agreement was clearly marked “MBS-YELLOWSTONE RANCH, LTD SUBSCRIPTION AGREEMENT,” evidencing that the agreement was between Yellowstone and Dr. George. Moreover, the real estate investment summary, which Mr. Donner acknowledged receiving, states “REAL ESTATE INVESTMENT SUMMARY OF MBS-YELLOWSTONE RANCH, LTD.” That document then goes on to explain that Yellowstone was being presented by Michael B. Smuck of the MBS Companies. Finally, Dr. George’s check was made payable to MBS Yellowstone Ranch, Ltd. Thus, the evidence lends credence to the trial court’s finding that the agreement was between Dr. George and MBS-Yellowstone Ranch, Ltd.
Dr. George, however, relies on Causeway Mortgage Co. Inc. v. Dordain, 247 So.2d 277, 278 (La.App. 4 Cir.1971), for the proposition that “... when one of two innocent persons must suffer by the act of a third person, the loss must fall upon the one of them who has furnished the third person with the means of doing the injury.” In that case, Phillips sought to rescind the sale of immovable property he purchased at public auction. The sheriff advertised the sale in the newspaper | nbut inadvertently attached the wrong photograph to the legal description. Once Phillips visited the property, he discovered that the house was a “dilapidated, tar-paper covered, shotgun type shack” as opposed to the “well kept, freshly painted, fenced in home he saw in the photograph.” Id. In that case, the Fourth Circuit stated that “there [was] some evidence to the effect that Causeway Mortgage knew or should have known that the picture shown was not of the premises sold.” The court determined that because Causeway’s attorney attended the sale, placed a bid on the property, and prepared the petition for executory process, “it [could] reasonably be deduced that Causeway Mortgage Company, Inc. examined the property at the time of making the loan and thus would have knowledge of the type of house and improvements situated on the lot.” Id.
Unlike Causeway Mortgage, there is no evidence in this case, other than Mr. Donner’s testimony, which suggests that Mr. White had any knowledge that Yellowstone had not been formed at the time Mr. Donner delivered the check.
Nevertheless, Dr. George argues that Mr. White cannot avoid personal liability by alleging that it was Mr. Smuck who failed to invest the $200,000.00 in Yellowstone. To support this argument, Dr. George relies on La. C.C. art. 1977 which provides that “[t]he object of a contract may be that a third person will incur an obligation or render a performance. The *1043 party who promised that obligation or performance is liable for damages if the third person does not bind himself or does not perform.”
The revision comments to La. C.C. art. 1977 explain in pertinent part:
(b) This Article contemplates the transaction called promesse de porte-fort: a contract the object of which is an act to be done by another party. A promesse de porte-fort is a security device that resembles suretyship in that the promi-sor, or porte-fort, is bound only if the third person does not satisfy the obligee, but differs from suretyship in that the promisor never becomes an accessory obligor. For as long as the third person does not bind himself, the promi-sor | ^remains the sole obligor, and as soon as the third person binds himself the promisor is released, (citations omitted).
In order for promesse de porte-fort to apply in this case, evidence must have been introduced to show that Mr. White, the alleged third party, bound himself in his personal capacity to invest Dr. George’s $200,000.00. For instance, if Dr. George had introduced a $200,000.00 check made payable to Ed White, one could reasonably conclude that Mr. White personally agreed to invest Dr. George’s money. However, no such evidence was introduced in this case. All the evidence in this case indicates that the agreement was between Dr. George and Yellowstone — an entity that never existed. Because Yellowstone was never formed, Dr. George argues that he could not have contracted with it. Rather, he contends that Mr. White is personally liable for the losses he sustained because he dealt directly with Mr. White and because Mr. White failed to disclose that he was acting as an agent for Ed White and Associates, LLC or Ed White and Associates, Inc.
Generally, an agent is held to have bound himself personally when he enters into an agreement without disclosing the identity of his principal. Frank’s Door & Bldg. Supply, Inc. v. Double H. Constr. Co., Inc., 459 So.2d 1273, 1275 (La.App. 1 Cir.1984). As the First Circuit explained in J.T. Doiron, Inc. v. Lundin, 385 So.2d 450, 452-3 (La.App. 1 Cir.1980):
The general rule ... places an affirmative duty on the agent to tell those with whom he is dealing that he is an agent acting for a certain principal. Absent disclosure of a special status, the law presumes that a person is acting in his individual capacity and holds him personally liable for his actions. The person who claims he is acting as an agent bears the burden of proof at trial to show this special status.
What constitutes disclosure sufficient to put a third party on notice of a prinei-pal/agent relationship has been the turning point of some cases, (citations omitted). Certainly, actual written or verbal communication by the agent to the party with whom he is dealing is the best method to disclose the agent’s status. The agent who reveals his status and his principal’s identity in such a way has performed the | ^affirmative duty placed on him by the law and has removed the presumption that he acted in his individual capacity.
But when such a straightforward disclosure is not employed, an agent still may be able to escape individual liability by proving that sufficient indicia of the agency relationship were known by the third party to put him on notice of the principal/agent relationship. Express notice of the agent’s status and the principal’s identity is unnecessary if facts and circumstances surrounding the transaction, combined with the general knowledge that persons in that type of *1044 business are usually acting as agents, demonstrate affirmatively that the third person should be charged with notice of the relationship, (citation omitted).
In this case, there is no evidence that Mr. White expressly informed Dr. George, through Mr. Donner, that he was acting as an agent for Ed White and Associates, LLC or Ed White and Associates, Inc. This Court must, therefore, look to the facts and circumstances surrounding the transaction to determine whether Dr. George was apprised of the agency relationship.
Whether or not an agency relationship has been disclosed must be decided on a case-by-case basis. J.T. Doiron, supra, at 452. At the court below, the trial court made the following factual findings:
Mr. Donner ... contacted Mr. White at the offices of Ed White & Associates, Inc. Mr. Donner delivered the investment check to these same offices. Information regarding the investment is contained on the letterhead of Ed White & Associates, Inc. The Court finds that Mr. White adequately disclosed the identity of his business with respect to the investment opportunity.
In Martin Home Center, Inc. v. Stafford, 434 So.2d 673, 674 (La.App. 3 Cir.1983), a case upon which Dr. George relies, the Third Circuit determined that the agency relationship was not sufficiently disclosed. In that case, defendants Stafford and Smith purchased merchandise from Martin Home Center on an open account. Once Martin Home Center filed suit to collect the indebtedness, Stafford and Smith revealed that the purchases were made on behalf of their corporation, New Creations Enterprise Inc. In order to prove that the agency relationship had been disclosed, Stafford and Smith introduced a check drawn on the account of New Creations Enterprise, Inc.; a purchase order, bearing the letterhead or caption, _Jj4New Creations Enterprise Inc.; and a group of invoices made to New Creations Enterprise Inc. Id. The Third Circuit determined that those documents, along with Smith’s self-serving testimony, were insufficient to establish that an agency relationship had been disclosed. Id. at 674.
In Andrus v. Bourque, 442 So.2d 1383 (La.App. 3 Cir.1983), the Third Circuit also determined that the defendant was personally liable for the debt. In that case, the court noted that “[t]here is no evidence in the record, other than the uncorroborated testimony of Jerry Bourque, to indicate that William Andrus was made aware that any printing was being done on behalf of a corporation prior to the order placed on December 4, 1981.... ” Id. at 1387. It further explained that “... nowhere on the ledger, the job orders, the invoices or on any of these printed materials do the words ‘corporation’ or ‘incorporated’ or their abbreviations in any form appear. The record is totally lacking of any indication of any agency relationship sufficient to have put Andrus on notice of a principal-agent relationship.” Id.
In J.T. Doiron, on the other hand, the court determined that the agency relationship was sufficiently disclosed because the meeting occurred at the corporation’s office, “upon which was prominently displayed the logo of Tasco.” Id. at 453. The court further noted that a report indicated that one of the properties appraised was assessed to Tasco, and that several witnesses testified that the defendant was representing Tasco in any conversation he had with the plaintiffs.
In Martin Home Center and Andrus, the Third Circuit found that the agency relationship was not sufficiently disclosed. We note, however, that Martin Home Center explained that express notification is *1045 not always necessary “if the facts and circumstances surrounding the transaction demonstrate affirmatively that the third 11sperson should be charged with notice of the relationship.” Martin Home Center, supra, at 674. In this case, there was testimony and evidence from which the trial court could have found that Dr. George, through Mr. Donner, had notice of the agency relationship. Unlike Anders, the documentary evidence in this case corroborates Mr. White’s testimony that he never conducts business with third parties in his personal capacity. The August 8, 2007 letter which announced the formation of Yellowstone was drafted on Ed White & Associates, Inc.’s letterhead, and the real estate investment summary prominently states:

General Partner

The General Partner of the Limited Partnership will be a newly formed Texas limited liability company controlled by its Managing Member, Michael B. Smuck. The other Member of the General Partner will be Ed White & Associates, L.L.C., a company owned by Ed White, C.C.I.M. (emphasis added).
Furthermore, as in J.T. Doiron, Mr. Donner’s initial meeting with Mr. White occurred at the office of Ed White and Associates. In fact, Mr. Donner testified that he returned to the office of Ed White and Associates once the debacle was exposed, after being summoned there by Mr. White’s secretary.
Taken together, the facts in this case demonstrate that Dr. George had notice of the agency relationship. Thus, we cannot say that the trial court was manifestly erroneous in its determination that no contract existed between Dr. George and Mr. White or in its determination that Mr. White bears no personal liability.
Therefore, these assignments of error are without merit.

Third Assignment of Error

Finally, Dr. George contends that Mr. White is liable under the Louisiana Securities Laws, La. R.S. 51:701, et seq. for circulating false statements in offering to sell a security. Specifically, he contends that Mr. White violated La. R.S. 51:712(A)(2) by circulating the MBS Yellowstone Ranch Subscription 1! (Agreement, which stated, among other things, that the “partnership was recently organized,” when it had not been.
La. R.S. 51:712(A)(2) states that it shall be unlawful for any person:
[t]o offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission. (emphasis added).
Dr. George has offered no evidence that Mr. White knew or “in the exercise of reasonable care” could have known, that the statements made in the subscription agreement were not true. He only states that the “subscription agreement clearly and falsely stated that the partnership had been formed and that there was an existing partnership agreement.” The lone fact that the subscription agreement contained information that was untrue does not lead to the conclusion that Mr. White was aware of the falsity of the information contained therein.
In this ease, Mr. White testified that Mr. Smuck always had 100% managing authority and bore the responsibility of handling *1046 all of the legal and financial matters. Dr. George did not present any evidence to rebut this testimony. In fact, Dr. George states in his brief that, “such a finding by the trial court even ignores Mr. White’s own testimony that he found out later no partnership had been formed.” (emphasis added). Dr. George’s admission demonstrates his appreciation of the fact that Mr. White did not know that Yellowstone had not been formed when he decided to invest $200,000.00.
Because Dr. George failed to prove that Mr. White knew of the untruth or omission in the exercise of reasonable care, this assignment of error is without merit.
|17ConcIusion
Mr. White answered the appeal, asserting two separate assignments of error, if this Court reversed the trial court’s judgment. Because this Court is affirming the trial court’s judgment, Mr. White’s assignments of error are rendered moot. Accordingly, the judgment appealed from is affirmed.

AFFIRMED

. Mr. Donner’s first name is spelled "Alan” and "Allen” in the record.

. A similar provision is also found in Paragraph 6(d) of the subscription agreement.

. The other investors' checks, which were made payable to Yellowstone Ranch, were also deposited into the MBS Realty Investors account at Whitney National Bank.

.Prior to the filing of the suit presently before this Court on appeal, Dr. George filed a Petition against Regions Bank in the 24th Judicial District Court on February 21, 2008. Regions then filed a Notice of Removal in the United States District Court for the Eastern District of Louisiana, alleging diversity of citizenship. The case was subsequently removed to the federal district court. The Eastern District of Louisiana issued a judgment on June 26, 2009, which granted judgment in Regions' favor and dismissed Dr. George's suit with prejudice. The judgment further dismissed all third party claims and cross claims related to the matter.

. The trial court also orally denied the exception of res judicata; however, the written judgment is silent on the issue.

. At the time of trial, Dr. George had been reimbursed in the amount of $100,488.94 pursuant to the assignments of rights.

. We note that Dr. George only filed suit against Mr. White in his personal capacity. The lawsuit does not name Mr. White's entities nor does it name Mr. Smuck or the Smuck entities.